450 P.2d 188

In the Matter of Jess R. NELSON,
Attorney at Law.

No. 8533.

Supreme Court of New Mexico.

Feb. 3, 1969.

See also 78 N.M. 739, 437 P.2d 1008.

Robert S. Skinner, Raton, amicus curiae, for Board of Bar Commissioners.

Jess R. Nelson, Truth or Consequences, pro se.

## OPINION

PER CURIAM.

The Commissioners of the New Mexico State Bar, sitting as referees under the provisions of § 21–2–1(3), N.M.S.A.1953, 1967 Pocket Supp., recommended the suspension of respondent for an indefinite period.

The Commissioners made detailed findings of fact, the majority of which are not controverted. Respondent's principal objection to the findings seemingly is that the Commissioners did not see fit to accept respondent's explanation of the facts, and, of course, respondent strongly protests the conclusions drawn from the facts themselves.

We summarize the rather involved factual situation: From 1954 through most of January of 1963, respondent acted as attorney for a Mrs. Rosie Messinger, in connection with certain legal matters including the ancillary proceedings of Mrs. Messinger's husband's estate, clearing of certain mineral interests, matters in connection with the probate of the husband's estate in Texas, and other general financial matters. On February 9, 1957, respondent prepared, and there was executed, an agreement between Mrs. Messinger and himself, respondent agreeing to perform legal service in exchange for a conveyance of certain real estate on condition that Mrs. Messinger would receive the rents and use for life. In connection with this agreement, the client executed a general warranty deed to respondent and his wife, but the deed contained no reference to any reservation of a life estate. On August 11, 1958, another agreement was prepared, providing that the February 9, 1957, agreement had been fully performed. Thereafter on January 19, 1960, another agreement was executed, terminating the life estate previously mentioned, on condition that respondent would pay the client $50.00 a month for life. On October 27, 1960, another agreement was entered into relating to legal services, by which the client agreed to convey certain unimproved lots to respondent and a warranty deed was issued in conformity therewith. On June 19, 1962, the client executed a deed, prepared by respondent, to all her mineral interests in the State of Texas, and this deed was immediately recorded. On September 14, 1962, the client executed a warranty deed to certain real property to respondent and his wife, which was, by its terms, absolute. On September 25, 1962, the client executed an agreement, prepared by respondent, which set forth that the mineral deed executed in June, 1962, had been made in consideration of the cancellation of certain indebtedness owing from the client to respondent and in consideration of legal services. Also on September 25th, the client executed an agreement which stated that the September 14th deed was given as security for existing and future loans, and that if the property were not sold, it was to be in full payment of all loans outstanding and professional services due upon the death of the client. On this same date, respondent prepared a will for the client, which provided that one-third of the client's property would go to respondent's two daughters. Respondent admittedly disclosed the contents of this will to the grandson of the client, contrary to the specific instructions of the client not to do so. In January of 1963, respondent was discharged as attorney. In none of the agreements or the deeds did the client have independent legal advice, and in this connection the referees found that respondent did not make full and frank disclosure of all relevant information concerned therewith. The referees further found that, in all of the transactions mentioned, respondent put his own interests above those of his client.

Based upon the findings summarized above, the referees concluded that respondent had breached the confidential and fiduciary relationship between lawyer and

client; that his acts were contrary to honesty, justice and good morals, and that his conduct placed his own interests above those of his client and was for his own personal benefit or gain.

This case involves an extremely tangled lawyer-client relationship which extended over several years, basically concerned with the property owned by an elderly lady. Prior to this disciplinary proceeding, there was a civil action which was filed on September 12, 1963. This case is fully reported as Van Orman v. Nelson, 78 N.M. 11, 427 P.2d 896 (1967), and concerns us in this proceeding because the evidence in that case of dealings between respondent and his client, including approximately 700 pages of respondent's testimony, was admitted in this proceeding and considered by the referees.

■ Respondent objected to the use of his own testimony in the prior case, and continues to protest in this court. In effect, the objection was that the prior testimony would reflect the bias and prejudice of the trial court in that case, that the burden of the proof in the prior case was different from that in the disciplinary proceeding, and that the testimony was not admissible other than for impeachment, because respondent was present and available to testify.

The objection is not well taken. The transcript was admittedly correct and complete, it is fully proper, and, if admissible for no other reason, it is certainly admissible as an admission by a party against his interest and therefore competent evidence. In Re Ellis, 371 Ill. 113, 20 N.E.2d 96 (1939); and In Re Tuttle, 371 Ill. 153, 20 N.E.2d 98 (1939). Cf. State ex rel. Nebraska State Bar Ass'n v. Gudmundsen, 145 Neb. 324, 16 N.W.2d 474 (1944); Louisiana State Bar Association v. Sackett, 234 La. 762, 101 So.2d 661 (1958); In Re Pate, 232 Mo.App. 478, 119 S.W.2d 11 (1938); Simmons v. Westwood Apartments Company, 46 Misc.2d 1093, 261 N.Y.S.2d 736 (1965); annot., 161 A.L.R. 898.

■ In connection with the use of this testimony, respondent also urges that it was error for the referees to read the testimony of the prior trial outside of his presence. No authority is given for this contention, nor do we believe it is well taken.

■ Respondent also urges that the complaint against him was not sufficiently definite to inform him of the charges. In this connection, respondent really claims that the whole difficulty merely concerned attorney's fees, and that therefore he should have been accused under § 2.07 (§ 21-2-1(3) (2.07), N.M.S.A.1953, 1967 Pocket Supp.), rather than being charged with a violation of §§ 2.01 and 2.04 (§§ 21-2-1(3) (2.01) and (2.04), N.M.S.A.1953, 1967 Pocket Supp.) and Canons 11 and 12 of the Canons of Professional Ethics. Canons 11 and 12 are well known to the Bench and Bar and need not be repeated here, other than to say that Canon 11 relates to lawyers' dealing with trust property and Canon 12 relates to fixing of fees and the considerations that may be used in determining the amount of the fee. The rules, however, as far as applicable to this case, are:

"2.01. All of the members of the bar have taken an oath to support the Constitution and the laws of this state and of the United States. As officers of the court, they are charged with obedience to these laws, both in and out of court, and to observe the high standards of professional conduct. Traditionally, standards for lawyers have been higher than expected of laymen. A license to practice law is a proclamation by this court that the holder is one to whom the public may entrust professional matters. The lawyer must be true to that trust and his confidential relationship to his client, whether such client be a public body or a private individual."

"2.04. The commission of any act contrary to honesty, justice or good morals, whether the act is committed in the course of his relations as an attorney or otherwise, and whether or not the act is a

felony or misdemeanor, constitutes a cause for discipline. If the act constitutes a felony or misdemeanor, conviction thereof in a criminal proceeding is not a condition precedent to discipline.

"* * *

"A lawyer who has acted contrary to the standards of conduct set forth in the canons of ethics of the American Bar Association, heretofore adopted as rules of conduct for attorneys in this state, may be found guilty of conduct constituting a cause for discipline."

Also, because of respondent's contention that he should have been charged under § 2.07, we take note of the fact that the last sentence of this section, which is the foundation of respondent's claim, is as follows:

"* * * Controversies as to the amount of fees shall not be considered a basis for charges in a disciplinary proceedings unless it is charged that the amount demanded as fees is extortionate or fraudulent."

We would here pause to observe that the court has carefully considered not only the testimony given by respondent at the prior trial (of some 700 pages), but also has carefully read the over-400 pages of the transcript taken at the actual grievance proceeding. Having done so, it seems to us that, based on this evidence alone, an argument that this entire controversy is merely over the amount of fees is almost incomprehensible. The question of overcharging a client was simply not in issue or the basis of the commissioners' decision, although respondent claims otherwise. It seems to us that it is particularly unfortunate that he fails to recognize that in his dealings with this elderly lady over a period of seven years, there was every evidence of over-reaching and placing of his own interests over those of his client. Respondent, according to his own testimony, was representing a person whom he knew had been hoodwinked by others, and it was fully apparent that she was susceptible of being duped and outwitted.

This is particularly shown to be true in the preparation of certain deeds under which it was understood that the client would retain a life estate, yet the deeds, being absolute in form, were so prepared by respondent and, according to his own admission, in order that there would be no difficulty insofar as probate upon the death of the client. Again, although one must read all of the transcript to get the full flavor and tenor of the situation, a clear violation of our rules and the Canons of Ethics appeared at the time respondent obtained the deed to the mineral interests in Texas, when neither he nor the client knew exactly what he was buying or what she was selling. We need not relate other examples of over-reaching or acts breaching the fiduciary relationship, or acts contrary to honesty, justice and good morals. The record fairly abounds with such incidents. The records kept by respondent, such as they were, failed to reflect a full and frank disclosure of all relevant information of the value of the property obtained, or of the value of the legal advice given. Even at the time of the hearing before the referees, although several years had elapsed since the original litigation, respondent was unable to give any satisfactory computation of the total value he had received in property; and, for all the referees could tell (and the same applies to this court), a large part of his claimed charges were by reason of what he himself termed "baby-sitting" activities. We would here observe that Mrs. Messinger was a very elderly lady, who has since gone to her reward, but it was never satisfactorily determined what her age was during the time in controversy. Some witnesses testified that she claimed to have been born in 1885, but other witnesses cast doubt upon this date, and it may be that she was considerably older than she admitted. A reading of her testimony taken at the prior trial (which took place in May of 1964) makes it quite apparent that she was at that time in a fairly advanced stage of senility. There was testimony of her impaired mental capacities presented be-

fore the commissioners, but other testimony to the effect that she was fully possessed of all her faculties, although somewhat difficult to get along with.

█ In any event, we find it inescapable, considering the totality of all of the circumstances, that even though it might be believed that respondent really intended no wrong, nevertheless this is not sufficient to justify what occurred. Membership in the Bar requires more than a mere absence of intention to do wrong; otherwise our high standard of conduct could not be maintained. In Re Moyer, 77 N.M. 253, 421 P.2d 781 (1966). Our examination of the record convinces us that the explanations by respondent of his actions fall far short of being satisfactory. In Re Renehan, 19 N.M. 640, 145 P. 111 (1914); and In Re Barth, 26 N.M. 93, 189 P. 499 (1920). See, also, Iriart v. Johnson, 75 N.M. 745, 411 P. 2d 226 (1966).

We do not propose to particularize the attempted explanations, but, by way of illustration, one example should suffice. Throughout Nelson's testimony, both in the civil trial and in this proceeding, he continued to give assurance that, even though the conveyances made by Mrs. Messinger were, by their terms, outright, nevertheless his word was such that the life-estate interest would be preserved and payments would be made by him as agreed. Even when asked what would have happened should he have died before Mrs. Messinger, he stated that his widow would have carried on the agreements. Such an attitude cannot be reconciled with the facts, since, although the last contract provided that half of the property would be returned if there were any "unfulfilled duties," nevertheless the deeds all conveyed a fee simple title and were recorded, whereas the contracts were neither acknowledged nor subject to recording. Thus Mrs. Messinger was left without recourse should respondent have died or other change of circumstances occurred. We do point out, however, that the amounts which respondent agreed to pay the client were punctually remitted.

It is claimed that certain of the findings are not supported by clear and convincing evidence. In making this contention, respondent reasons that, having made what he claims to be a full and frank disclosure of all the circumstances, this is all that is required and findings to the contrary are not supported. It would seem respondent argues that having made an explanation, it must be believed. We cannot agree. The story as told by respondent was obviously not satisfactory to the referees, nor is it to us. Respondent's actions fail to meet the standards required of him either as an attorney (In Re Moyer, In Re Renehan, and In Re Barth, supra) or as a trustee (Iriart v. Johnson, supra).

█ Another of respondent's contentions is that, in some way, he had been denied procedural and substantive due process of law and equal protection of the law. It is difficult to analyze this contention, principally because the authority given by respondent relates to what he terms "selective discipline." Respondent fails to point out how he was deprived of a fair hearing, or in what way he was denied the right to defend himself. The argument seems to be with the Supreme Court Rules relating to discipline and as the rules were construed in In Re Morris, 74 N.M. 679, 397 P.2d 475, 17 A.L.R.3d 681 (1965). Respondent based his support for his argument upon a Law Review article appearing in 5 Natural Resources Journal 299; however, sight is lost of the basic thrust of the Law Review article, because, while it mentions possible equal protection arguments which might be advanced, it was principally concerned (rightly or wrongly) with criticism of the Morris case as being discipline for conduct not involved in the practice of the profession. So such an argument, even if it had merit, has no validity here, because the conduct charged against Nelson is wholly and entirely concerned with his activity as an attorney. Hunker v. Melugin, 74 N.M. 116, 391 P.2d 407 (1964), which is also relied upon by respondent, did not

relate to disciplinary action and is not in point in this instance.

In any event, Nelson has been deprived of no procedural or substantive due process of law, and he has received equal protection of the law. Punishment is not being meted out. The action is required for "the protection of the public, the profession, and the administration of justice, and not the punishment of the person disciplined." See, Preamble, Rules for Disciplinary Proceedings, appearing as a Compiler's Note following § 21–2–1(3) (1.08), N.M.S.A.1953, 1967 Pocket Supp.

Lastly, Nelson argues that suspension as recommended by the referees is tantamount to disbarment in most jurisdictions. He says that, under our rules, the readmission can be allowed only after the passage of a minimum of time, and that at the time of such proposed readmission, the lawyer must show by "clear and convincing evidence" his fitness to practice. Somehow it is claimed that this is an unfair requirement, although the argument is left without any conclusion. It was probably by reason of this that the answer brief did not even feel called upon to respond to the point. In any event, the rule is applicable to all members of the Bar and is no more prejudicial to respondent than any other attorney.

One last matter need be mentioned Throughout Nelson's brief, it is urged that the burden is on the referees to convince the court that discipline should be meted out. As a matter of fact, the brief in chief sought to require amicus to assume the burden of stating all of the facts and supporting them. The implication was at least raised that, following the filing of the answer brief, respondent would then rebut any matters stated by amicus. Amicus, in an effort to bring the case to its conclusion at an early date, there having been many unforeseen delays at an earlier time, set out a statement of facts including the findings and conclusions of the referees, and fully complying with the rules with respect to transcript references and other matters. This brief by amicus was filed on September 16, 1968, and the case set for hearing on October 21, 1968. During the intervening time and even to the present, Nelson did not file any further brief, and in no sense controverted the approach taken by amicus. Thus it must be taken as conclusive that respondent has waived any right, if any he had, to respond to the factual assertions made in the answer brief, other than, of course, those which were presented at oral argument.

It is apparent that Nelson performed a great many favors for Mrs. Messinger. She relied upon him for many things other than pure legal advice and services. According to his testimony, he visited with her at her home approximately four times a week on an average of thirty minutes per visit, between October 1960 and June 1962; he frequently paid her bills, straightened out traffic violations, and hired nurses. It is therefore difficult to say what value or how much time should have been allocated for legal assistance.

Although fully realizing the dangers in summarizing the overall situation, we believe that the following is a true characterization of what occurred: At the commencement of the attorney-client relationship, Mrs. Messinger had an estate worth considerably in excess of $30,000.00, a large portion of which, other than the home which she owned and in which she lived, was income-producing. Between six and seven years later, at the conclusion of the attorney-client relationship, Mrs. Messinger's income was reduced to less than $100.00 per month, which was paid to her voluntarily by respondent with nothing in writing evidencing her legal right thereto, and the title to all, or almost all, of her property was in the name of Nelson and his wife. This was all accomplished without any independent legal advice ever having been given to Mrs. Messinger other than that given by Nelson himself.

In our opinion, the conduct of the respondent here constitutes a failure to observe the high standards required of him

as an officer of this court, a failure to be true to the trust required in dealing in professional matters, and contrary to the Canons of Ethics adopted by us as standards of conduct for attorneys in this State.

The matter of discipline is always difficult. It is particularly so in this instance, when both the referees and the members of this court know the respondent well. Nevertheless, we are convinced that the findings and conclusions made by the referees are fully supported by clear and convincing evidence. As a matter of fact, considering all of the circumstances, the activities of Nelson would justify findings and conclusions infinitely more severe than those made by the referees. We do not believe there is any other conclusion to be reached than that arrived at by the referees, and, in our judgment, it should be approved and is made as a conclusion by this court, based upon our own independent examination of the record.

The recommendation of the commissioners, that respondent be suspended from the practice of law for an indefinite period, will be approved. An order of suspension will be made. Costs are taxed against respondent. It is so ordered.

TACKETT, J., not participating.